IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No.

LATRICIA FERRIS,

     Plaintiff

v.

COMCAST CABLE COMMUNICATIONS MANAGEMENT, LLC.

     Defendant

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Latricia Ferris, by and through her attorney, Samantha L. Pryor, Esq. of The Halliburton Law Firm, LLC alleges and avers the following:

### PARTIES

1.    Plaintiff Latricia Ferris ("Ms. Ferris") is a United States citizen and resident of Denver, Colorado.

2.    Defendant Comcast Cable Communications Management, LLC ("Defendant" or "Comcast") is a Colorado Limited Liability Company with a principal place of business located at 1701 John F. Kennedy Blvd., Philadelphia, PA 19103.

### JURISDICTION AND VENUE

3.    Ms. Ferris brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* (employment discrimination, harassment, and retaliation).

4.	Ms. Ferris exhausted her administrative remedies by filing Charges of Discrimination with the Colorado Civil Rights Division ("CCRD") and the Equal Employment Opportunity Commission (the "EEOC") on or about October 30, 2020.

5.	The EEOC issued a Notice of Right to Sue Letter to Ms. Ferris on November 30, 2022.

6.	This Court has subject matter jurisdiction over his matter pursuant to 28 U.S.C. § 1331 (federal question).

7.	This Court has personal jurisdiction over Defendant who conducts business in the District of Colorado.

8.	Venue is proper in the District Court for the District of Colorado pursuant to 28 U.S.C. § 1391 because the unlawful practices alleged herein occurred within the District of Colorado.

### JURY DEMAND

9.	Ms. Ferris requests a trial by jury for all counts and issues so triable.

### NATURE OF THE CASE

10.	This case is about Comcast's discrimination and failure to provide an inclusive environment for its diverse employees, particularly Ms. Ferris and other Black women executives in Comcast's West Division.  Comcast has continued to engage in a pattern and practice of racial discrimination and retaliation against minority employees, particularly Ms. Ferris and other Black women, in violation of Title VII of the Civil Rights Act of 1964 (as amended) and other federal and state laws.

11.     Although Ms. Ferris and other employees have repeatedly complained to Comcast regarding concerns of discrimination and retaliation, Comcast has repeatedly failed to take prompt and appropriate remedial action to address, prevent, and correct discriminatory practices in the workplace. Comcast has also failed to promote Ms. Ferris based on her race (Black) and gender (female), despite her qualifications. Comcast has instead given promotions to violators of Title VII. Comcast has demoted, punished, and retaliated against Ms. Ferris and others who have raised concerns about discrimination.

## STATEMENT OF FACTS

### A. Background

12.     Comcast initially hired Ms. Ferris in February 2012 as a Technical Support Representative for Comcast's residential line of business.

13.     Due to a medical condition, Ms. Ferris was forced to resign from Comcast in December 2013.

14.     In August 2016, Comcast rehired Ms. Ferris as a contractor for the position of Business Process Analyst in the Comcast Business division.

15.     In December 2017, Comcast converted Ms. Ferris to a full-time employee in the role of Business Operation Specialist.

16.     Throughout her employment at Comcast, Ms. Ferris has established a great reputation for her innovative ideas.

17.     For example, in September 2017, while she was still a contractor, Ms. Ferris recommended that Comcast build a SharePoint site to hold and store Comcast's training documents.  Ms. Ferris drafted hundreds of new training documents with step-by-step

instructions on how to perform various tasks at Comcast, which were stored in the SharePoint database.

18.     Ms. Ferris also won innovation awards for designing various Comcast systems and lines of business such as the Comcast Shark Tank award in 2018 for her ideas regarding Mobility Entertainment.

19.     Unfortunately, Ms. Ferris has been subjected to a continuous pattern of discrimination and retaliation while working at Comcast dating back to at least 2018.

20.     After Ms. Ferris began raising complaints about these issues, Comcast's supervisors, managers, and Human Resources Department ("HR"), began retaliating against Ms. Ferris and others who supported her position.

21.     Various Comcast employees, including, but not limited to, Ms. Ferris' supervisors, Andrew Bundy ("Mr. Bundy") and Krista Jones ("Ms. Jones"), have engaged in discriminatory and retaliatory actions dating back to 2018.

22.     Most notably, in August 2018, Ms. Ferris overheard Mr. Bundy and Ms. Jones laughing and talking about how it was okay for the police to kill Black people. They talked about how Ms. Jones joined the volunteer police force so she could join in to kill Black people.  Naturally, Ms. Ferris was highly offended by her supervisor's remarks, and she did not feel safe.

23.     Ms. Ferris followed Comcast's "EEO policies" and immediately reported the incident to her manager, Christina Massey ("Ms. Massey").

24.     Ms. Massey did not take appropriate or prompt action.  As a result, Ms. Jones and Mr. Bundy continued their same conversation a few days later.  Ms. Jones

4

mentioned how Comcast should have active shooter drills, which made Ms. Ferris feel uncomfortable, especially in light of Ms. Jones' outrageous comments about killing Black people.

25.     Ms. Ferris reported the conversation to Ebony Jenkins ("Ms. Jenkins") in Comcast's HR.

26.     As soon as Ms. Ferris complained to Comcast's managers and HR, Ms. Ferris had a target on her back, and Comcast and its employees began retaliating against Ms. Ferris in numerous ways.

27.     A meeting was held in August 2018 with Ms. Jenkins, Mr. Bundy, Kristy Stephens, Ms. Massey and Ms. Ferris to discuss Ms. Ferris' concerns.  Near the end of the meeting, Ms. Massey and Mr. Bundy issued a verbal warning to Ms. Ferris because she was asking questions about productivity.

28.     One month later, in September 2018, Comcast demoted Ms. Ferris and asked her to train replacements for all of her leadership positions.

29.     Comcast took no meaningful action to address Ms. Ferris' legitimate complaints.

30.     In fact, instead of taking appropriate corrective action against Ms. Jones, Comcast hired Ms. Jones (who was initially a contractor) as a full-time employee and promoted her to act as Ms. Ferris' Quality Control Lead.

31.     Comcast later promoted Ms. Jones to a Project Lead Business Operations position. Comcast eventually promoted Ms. Jones to a position on Comcast's Residential Team.

32.     After Comcast demoted Ms. Ferris and removed her from various projects, Comcast required Ms. Ferris to continue working under Mr. Bundy's supervision, despite her valid concerns.

33.     As a direct result of Comcast's failure to take prompt remedial action, Mr. Bundy, Ms. Jones, HR and other Comcast employees created and perpetuated retaliatory and hostile work environment for Ms. Ferris.

34.     In fact, despite raising serious concerns about Mr. Bundy's racist remarks and behavior, Comcast allowed Mr. Bundy to continue supervising Ms. Ferris for the next several months until January 2020.  During that time, Comcast permitted Mr. Bundy to continue his offensive, disrespectful, discriminatory, and retaliatory conduct toward Ms. Ferris.

35.     Again, Ms. Ferris followed Comcast's purported EEO policy and immediately reported Mr. Bundy's threatening conduct to her new manager, Michael Vallejo ("Mr. Vallejo").  Mr. Vallejo agreed to change Ms. Ferris' supervisor, but Mr. Vallejo claimed he could not make the change until after Mr. Bundy could prepare Ms. Ferris' performance review.

36.     Ms. Ferris raised concerns with Mr. Vallejo about Comcast allowing Mr. Bundy to prepare her performance review, knowing Ms. Ferris had been raising concerns about Mr. Bundy's racist remarks and behaviors.  Comcast and Mr. Vallejo ignored Ms. Ferris' concerns and allowed Mr. Bundy to prepare Ms. Ferris' performance review.

37.     Although Ms. Ferris scored higher than her set goals, Mr. Bundy gave Ms. Ferris a poor review, indicating she needed improvement.

38.     Comcast then switched Ms. Ferris' supervisor from Mr. Bundy to Devon DeCaro ("Ms. DeCaro") in January 2020.

## B.  **Continued Retaliation, Discrimination and Harassment**

39.     Even after switching Ms. Ferris' supervisor, Comcast required Ms. Ferris to complete various tasks and/or requirements, while not requiring Ms. Ferris' White peers to complete the same tasks and requirements.

40.     For example, unlike her White peer, Tawnya DosSantos ("Ms. DosSantos"), Ms. Ferris was forced to complete certain tasks and intensive leadership training to be eligible for Comcast's Linked 2 Leadership ("L2L") Program.

41.     In late 2019 and early 2020, Mr. Vallejo selected Ms. Ferris for the L2L program, and Comcast's HR and leaders agreed Ms. Ferris would be a good candidate for the L2L program.

42.     Due to the stressful work environment, Ms. Ferris went on a medical leave of absence from January 27, 2020 through March 17, 2020.

43.     When Ms. Ferris' medical leave of absence ended, the COVID-19 global pandemic began.

44.     Upon her return to work from medical leave, Comcast caused Ms. Ferris to experience significant technical issues that impacted her ability to perform her duties.  For example, Comcast failed to correctly categorize Ms. Ferris' job title and therefore, Comcast revoked Ms. Ferris' access to work on commercial accounts from March 2020 through June 2020.

45.     On or about July 7, 2020, Ms. Ferris raised concerns with Mr. Vallejo and Ms. DeCaro about whether the technical issues would impact her performance.  Mr. Vallejo and Ms. DeCaro confirmed that the technical issues would not impact her performance.

46.     Later in July 2020, after completing all of the requirements, Ms. Ferris was nominated for the L2L program, and she was accepted into the L2L program on or about July 31, 2020 after participating in a panel interview.  Ms. Ferris was scheduled to start the L2L program on October 12, 2020.

47.     However, on or about August 13, 2020, Mr. Vallejo and Ms. DeCaro issued a performance improvement plan ("PIP") to Ms. Ferris that was back dated to June 2020.

48.     Ms. DeCaro claimed the PIP was necessary because Ms. Ferris' productivity was low from March 2020 through June 2020.

49.     Ms. DeCaro further explained that Comcast was revoking its offer for Ms. Ferris to join the L2L program because she was no longer eligible for the L2L program while under a PIP.

50.     Notably, Comcast waited until September, and after Ms. Ferris had already been accepted into the L2L program, to "discipline" Ms. Ferris for alleged productivity issues.

51.     Comcast disproportionately issued discipline to Ms. Ferris because she is a Black woman and because she complained about discrimination.   Comcast's disproportionate disciplinary practices prevented Ms. Ferris and other Black employees from promotional opportunities.

52.     Comcast regularly promoted White employees instead of Ms. Ferris even when Ms. Ferris was objectively more qualified.

53.     For example, Comcast offered the L2L position to Ms. Ferris' White counterpart, Ms. DosSantos, even though Ms. DosSantos did not complete, and was not required to complete, any of the requirements for the L2L program.  Therefore, Ms. DoSantos was objectively not eligible for the L2L program either—but Comcast accepted Ms. DoSantos into the L2L program.

54.     In addition, Comcast promoted another White employee, Heather Harris ("Ms. Harris"), to a supervisor position, although Ms. Harris maintained low productivity in 2020.

55.     Ms. DosSantos, Ms. Harris and other White employees rarely reached their productivity goals, particularly during the global pandemic in 2020.

56.     However, Comcast did not discipline Ms. Harris, Ms. DosSantos or other White employees for productivity.  Instead, Comcast promoted Ms. Harris, Ms. DosSantos and other White employees despite having productivity issues.

57.     Comcast implemented its productivity model in a discriminatory manner that led to unlawful, retaliatory disciplinary actions and refusal to promote Ms. Ferris.

58.     Comcast's productivity model is set to record production numbers solely based on the number of cases employees are able to close. The tasks and projects that Comcast assigned to Ms. Ferris helped her team reach overall production goals, but the hours she devoted to those team tasks did not count towards her personal productivity.

59.     For instance, in addition to her normal duties, Ms. Ferris was responsible for drafting training documents, onboarding and training new team members, and various other time-consuming projects and tasks.

60.     In fact, Ms. Ferris' supervisors acknowledged that the productivity metrics did not accurately account for all of the meetings and extra work Ms. Ferris was required to perform on top of her already demanding position.

61.     Nevertheless, in the June 2020 PIP, Comcast threatened to terminate Ms. Ferris' employment if she was not 90% productive without errors moving forward. None of Ms. Ferris' White peers were held to such an unattainable standard, particularly during a global pandemic while Ms. Ferris was working remote with school-aged children.

**C. <u>Retaliation After Filing a Charge of Discrimination</u>**

62.     Ms. Ferris reached her breaking point with being passed up for promotions, discriminated against, and being ignored when seeking assistance from Comcast.

63.     Therefore, Ms. Ferris filed her initial Charge with the CCRD on Friday, October 30, 2020, and Comcast's HR was served with a copy of the Charge on the same date.

64.     Comcast wasted no time in retaliating against Ms. Ferris for filing her Charge. Just one week later, on Friday, November 6, 2020, Ms. Ferris' Manager cancelled a prescheduled meeting, stating he was "aware of the litigation" and no longer wished to have the meeting.

65.     On Monday, November 9, 2020, Ms. DeCaro, Ms. Ferris' team supervisor, randomly called a team meeting.  Team meetings are usually scheduled in advance to discuss business matters.

66.     During this random team meeting, however, the team did not discuss business at all. Instead, Ms. DeCaro and Ms. Jones instructed the team to reflect on how they "may not remember things clearly the longer time passes".

67.     Ms. DeCaro and Ms. Jones suggested that the team use Google to seek advice for their problems. Ms. DeCaro indicated that she would pass along information from her therapist regarding ways "to cope" with situations.

68.     It was obvious that the meeting was called to address Ms. Ferris' Charge in an utmost passive aggressive manner.

69.     On Thursday, November 12, 2020, less than two weeks after filing the Charge, Ms. Ferris lost access to most of her programs, and she was not able to complete her work.

70.     Comcast had already issued a PIP, claiming Ms. Ferris had productivity issues, and she also had a deadline the next day, November 13, 2020, to submit information for year-end performance reviews.

71.     Ms. Ferris immediately reported the issue to her superiors and to Comcast's Information Technology Department ("IT").

72.     The next day, November 13, 2020, Ms. Ferris lost access to the entire Comcast network, the West Support Shared Drive (the "Shared Drive").  The Shared

Drive is a network to which all West Division employees access to perform their daily functions.

73.     The Shared Drive stores policies and procedures for Comcast by division and group, as well as customer information that cannot be saved on employee's personal drive.  Without access to the Shared Drive, Ms. Ferris had no access to those requisite tools, and she could not adequately perform her duties.

74.     The Shared Drive also contains the performance dashboard.  Without access to the Shared Drive, Ms. Ferris could not track her performance on an weekly basis or determine if there were any errors on the dashboard regarding productivity.

75.     In a panic, Ms. Ferris contacted IT again, requesting assistance on restoring her access to the Shared Drive so she could work and meet her deadlines and other requirements.  Ms. Ferris also informed her superiors and kept them updated.  Ms. Ferris' access to the Shared Drive was not restored, and therefore, she was not able to work or meet her deadlines.

76.     By Monday, November 16, 2020 Ms. Ferris still had no access to the Shared Drive.

77.     When she contacted IT, the IT manager claimed they could not find Ms. Ferris' initial request for assistance.  Ms. Ferris texted her supervisors the ticket for the IT request.  She later learned her request was sitting on a low priority queue.

78.     On November 23, 2020, Ms. Ferris received a replacement laptop. However, it was much older than her normal laptop, and it was covered in cigarette ashes.

79.     Comcast failed to restore Ms. Ferris' access to the Shared Drive, and thus, her ability to work, until December 1, 2020—two weeks after her initial request for assistance.

80.     When Ms. Ferris attempted to log into the Shared Drive, she learned that someone removed her from Comcast's servers.  When Comcast added Ms. Ferris back into the server, she was entered as a "new hire" under the position of Technical Support Representative.

81.     Once again, Ms. Ferris did not have access to her normal workflow or systems, and she reported these issues to her supervisors.  As a result, Ms. Ferris was left out of virtual team meetings and business conversations that were vital to her role at Comcast.

82.     On November 30, 2020, Ms. Ferris learned that her white peer, Diana Thomas ("Ms. Thomas") had also experienced computer issues.  Ms. Ferris was shocked to see that Ms. Thomas' computer issues were fixed the next day, on December 1, 2020.

83.     Also, on November 30, 2020, Comcast terminated Ms. Ferris' colleague and only other Black employee on the team, Clifton Love ("Mr. Love").

84.     Upon information and belief, Comcast terminated Mr. Love in retaliation for raising issues about discrimination and retaliation, particularly regarding Ms. Ferris.

85.     Indeed, after Ms. Ferris filed her Charge, Comcast pulled Mr. Love into an interview and questioned him about whether he believed Ms. Ferris was being mistreated.

86.     Mr. Love had also filed complaints with HR, raising concerns about unfair treatment at Comcast.

87.     During the interview, Mr. Love explained that he believed there were some discriminatory practices at Comcast, specifically against him and Ms. Ferris.

88.     After Comcast terminated Mr. Love's employment, Comcast delegated all of Mr. Love's workload to Ms. Ferris, creating even more work for Ms. Ferris.

89.     In fact, the assignments Comcast provided to Ms. Ferris were required to be complete by December 4, 2020.  However, given that Comcast had not restored Ms. Ferris' access to the Shared Drive, it was not possible for Ms. Ferris to complete Mr. Love's workload by the deadline, let alone complete her own demanding workload.

90.     Comcast's managers, supervisors and HR have engaged in various other discriminatory and retaliatory practices towards Ms. Ferris, including, but not limited to, the following:

    a.  Requiring Ms. Ferris to work during Colorado hours while Ms. Ferris was working remotely in Texas due to a death in the family.  Comcast allowed Ms. Ferris' White peer, Ms. DosSantos, to work outside of normal Colorado work hours when she was working remotely after having a baby;

    b.  Implementing and using Ms. Ferris' ideas and innovations without giving Ms. Ferris credit or the ability to implement her own ideas while telling Ms. Ferris that her ideas were not feasible or that additional work needed to be done to launch her ideas;

    c.  Instructing Ms. Ferris to train her peers on how to run the programs she created, but not giving Ms. Ferris credit or the ability to implement her own ideas; and

d.  Engaging in various other unlawful employment practices based on Ms. Ferris'
protected status and/or because she engaged in protected activities under the
law.

91.    Ms. Ferris was working hard to be considered for a promotion, and she tried
to take advantage of all the opportunities that would presumably advance her within the
company.  Although Comcast authorized Ms. Ferris to engage in these projects and
committees, Comcast's leadership would then penalize Ms. Ferris for the time she spent
on those projects and committees.

92.    In November 2020, Ms. Ferris asked Ms. DeCaro if she could apply for a
board role with Comcast's Women's Network DE&I Committee (the "Women's Network").
The Women's Network was formed under Comcast's Employee Relations Group ("ERG").

93.    In January 2021, Ms. Ferris was notified that she was chosen as the Chair
of the Women's Network.

94.    Ms. Ferris' role as Chair of the Women's Network DE&I Committee involved
intense work and a significant amount of time.  Ms. Ferris was responsible for several
tasks, including, but not limited to, reviewing applications and interviewing employees to
join the National DE&I Council, educating employees from five different states about DE&I
issues, scheduling and hosting various meetings with 300-500 attendees, coordinating
and creating budgets for Women's Network events, and several other tasks.

95.    Comcast's Finance Vice President, Christine Watkins ("Ms. Watkins"),
selected Ms. Ferris to help lead the first townhall of the year for the Women's Network,

96. Ms. Watkins was a manager over Ms. DeCaro, and she continued to delegate tasks to Ms. Ferris, including educating the finance department on DE&I policies.

97. However, Ms. DeCaro, would not allow enough time for Ms. Ferris to complete those tasks.

98. The tasks Ms. Watkins assigned were part of Ms. Ferris' regular duties as Chair of the Women's Network and should have been counted as regular work hours towards her productivity.

99. However, soon after Ms. Ferris started her role as Chair of the Women's Network, Ms. DeCaro began hassling Ms. Ferris about the time she was spending on tasks Ms. Watkins assigned for the role.

100. In March 2021, Ms. Ferris raised concerns with Ms. Watkins about Ms. DeCaro not providing enough time for her to complete the tasks Ms. Watkins assigned. Ms. Watkins stated she would let Ms. DeCaro know that she was assigning Ms. Ferris tasks for the Comcast Business Finance organization.

101. However, Ms. DeCaro refused to consider the time as work hours towards productivity goals. Ms. DeCaro informed Ms. Ferris that she had to perform those tasks outside of work and on her own time.

102. Importantly, Ms. Ferris later learned that Comcast maintained a policy that *required* Ms. DeCaro to recognize up to 8 hours **per month** for ERG Board Leaders to handle ERG responsibilities during work hours.

103. Ms. DeCaro claimed Ms. Ferris had only 12 hours **per quarter**, instead of the 8 hours per month that was required under Comcast's ERG policy.

104.    Ms. DeCaro also intentionally sabotaged Ms. Ferris regarding the tasks Ms. Watkins asked her to perform.  For example, Ms. DeCaro went behind Ms. Ferris' back and submitted a list of outdated addresses to the mailroom for an upcoming meeting Ms. Ferris was planning. Ms. DeCaro instructed the mailroom to use her list of addresses instead of Ms. Ferris' list, which caused many individuals not to receive information required for the meeting in a timely fashion.

105.    Ms. Ferris routinely submitted requests to approve her time in advance of spending time on ERG or other projects.  Yet, Ms. DeCaro refused to approve Ms. Ferris' requested ERG time and merely stated Ms. Ferris could use that time as long as it was within the allotted 12 hours per quarter.

106.    At the same time, Ms. DeCaro continued asking Ms. Ferris to perform tasks outside of work and "off the clock" for over six months.

107.    Ms. Ferris finally sent an email to Ms. DeCaro, explaining that Comcast's policy forbids Ms. Ferris to continue working "off the clock".  Ms. Ferris also informed Ms. DeCaro of Comcast's ERG Policy.

108.    Ms. DeCaro refused to acknowledge the ERG Policy.

109.    Ms. Ferris even asked Alicia Barry ("Ms. Barry") in HR about the ERG Policy, who was not familiar with Comcast's ERG Policy.

110.    A few days later, Ms. Barry emailed Ms. DeCaro and confirmed that Ms. Ferris should be allotted up to 8 hours per month, especially as a Chair of the Women's Network DE&I Committee.

111.     Nevertheless, Ms. DeCaro continued to ignore the ERG policy for several months and insisted that only 12 hours per quarter was permitted.

112.     Critically, by refusing to acknowledge Comcast's ERG Policy, Ms. DeCaro eventually penalized Ms. Ferris for "gaps" in her work hours.

113.     In April 2021, Comcast changed Ms. Ferris' projects, which caused her productivity to go below goal for three months as the projects adjusted.

114.     During that time, Comcast held Ms. Ferris to different productivity standards than Ms. Ferris' White peers.  For example, Ms. Ferris closed 753 cases in March 2021, which was second highest number of cases closed.

115.     Meanwhile, Ms. Ferris' White peers, Carmen Para, Mr. Walkoviack, and Ms. DosSantos, only closed 6, 5, and 0 cases, respectively.  This trend continued throughout 2021.

116.     Ms. Ferris' supervisors refused to recognize that any "gaps" in Ms. Ferris' time were due to her work on the various projects to which Ms. Ferris was assigned, including being Chair of the Women's Network.

117.     On the other hand, Comcast attempted to justify the extremely low number of cases closed by Ms. Ferris' White peers by arguing that those peers were asked to help with complex projects.

118.     Although Comcast allowed Ms. Ferris to participate in projects and activities that were designed to help her elevate within the company, Comcast then penalized Ms. Ferris for the gaps in closing cases and alleged productivity issues.

### D. Continued Retaliation, Offensive Remarks, and Discrimination

119.    On or about May 24, 2021, Ms. Ferris' manager, Mr. Vallejo, held a DE&I huddle.  The group previously discussed the issue of privilege and participated in a self-survey to address implicit bias.

120.    Mr. Vallejo said he was upset how the media was somehow negatively portraying White supremacy.  Although Mr. Vallejo is a Hispanic man, he explained how he felt uneasy as a White man because the previous training identified him as being on the list of individuals who possess privileges that other races and/or genders do not enjoy.

121.    Ms. Ferris regularly trained hundreds of Comcast employees on DE&I issues, including implicit bias. She was very offended and taken aback that Mr. Vallejo, a Comcast Manager, would make such comments during the company's DE&I trainings.

122.    On or about July 19, 2021, Ms. Ferris learned that Comcast promoted her two White co-workers, Ms. DosSantos and Mr. Walkoviack.

123.    Ms. Ferris felt overlooked for a promotion once again and was not even aware that any promotional opportunities existed at the time.

124.    Ms. Ferris raised concerns with Ms. Barry in HR on July 23, 2021 and asked whether her peers' promotions were new positions and whether the positions were posted so other employees could apply[1].

---

[1] Comcast's failure to post these promotional opportunities was a direct violation of Colorado's Equal Pay for Equal Work Act, C.R.S. § 8-5-201, *et seq*.

125.  Ms. Barry claimed the positions were "inline" promotions and were not considered new roles.  Ms. Ferris knew that was not true and that Comcast was merely passing her up again for a promotion.

126.  Ms. Ferris wanted to leave Comcast's Western Division because of the blatant discriminatory and retaliatory practices.

127.  Ms. Ferris applied for positions outside of the Western Division and even asked permission to work remotely for a different state. She was not selected for those positions and Comcast refused to allow Ms. Ferris to work remotely from different states.

128.  However, Comcast had allowed its White employees, Carol Guillien ("Ms. Guillien") and Michael Hagen a/k/a "Chase" ("Mr. Hagen"), to work on Ms. Ferris' team from different states.

129.  Ms. Guillien was allowed to relocate to Texas, and Mr. Hagen was allowed to relocate to Arizona, and both employees remained on Ms. Ferris' Business Operations team.

130.  Nevertheless, Comcast told Ms. Ferris she could not relocate to Atlanta because it was outside of the "Denver footprint".

131.  Just like every other time Ms. Ferris inquired about a promotional opportunity, Comcast manufactured reasons to discipline Ms. Ferris so she would not be eligible for the promotion.

132.  On July 23, 2021, the same day Ms. Ferris inquired about her peers' promotions, Comcast issued a "Corrective Action" to Ms. Ferris.

133.    A few days later, on July 26, 2021, Comcast instructed Ms. Ferris to attend a meeting with Ms. DeCaro, Ms. Barry from HR, and Mr. Vallejo about the PIP from 2020.

134.    Ms. Ferris believed they were going to wrongfully terminate her employment or try and reinstate the PIP.  Therefore, she asked to record the conversation.

135.    Ms. DeCaro quickly objected and said Ms. Ferris should not be allowed to record the meeting.  Ms. Barry paused the meeting and then indicated the meeting would be rescheduled.  Ms. Barry did confirm Comcast planned to reinstate the PIP from the previous year.

136.    Critically, Comcast claimed the PIP was necessary because Ms. Ferris had low productivity since at least March 2021.  However, Comcast did not issue the PIP until July 2020 and only after she inquired about promotional opportunities and discrimination.

137.    Ms. Ferris felt completely defeated.  Ms. Ferris had already successfully completed the requirements of the 2020 PIP.  Ms. Ferris worked extremely hard to not only maintain her productivity above her YTD goals, but she also worked tirelessly to help Comcast build a better workforce by participating heavily in Comcast's purported DE&I initiatives.

138.    On July 27, 2021, Ms. Ferris had a panic attack due to extreme work-related stress.  Ms. Ferris immediately sought out a therapist, who advised that she take a mental health leave of absence.

139.    Based on that medical advice, Ms. Ferris went on medical leave of absence From July 27, 2021 through November 1, 2021.

140.    Ms. Ferris returned to the office on or about November 5, 2021.

141.    On or about November 11, 2021, Ms. DeCaro pulled Ms. Ferris into a meeting with Mr. Vallejo and presented Ms. Ferris with a Final Written Warning.

142.    The Final Written Warning was originally dated July 23, 2021. However, Ms. DeCaro changed the date to November 11, 2021, effective through May 9, 2022.

143.    Ms. Ferris' performance was not an issue because she was above her productivity goals in all areas.

144.    Ms. Ferris' hours were split between her regular daily tasks (e.g. case audits and special projects) and her work as a Chair of the Women's Network DE&I committee.

145.    Again, Ms. Ferris provided evidence of Comcast's ERG policy, which indicates that her work on the DE&I committees should be counted as work hours. Comcast ignored the ERG Policy and issued the Final Written Warning to Ms. Ferris anyway.

146.    Due to the Final Written Warning and PIP, Ms. Ferris was not eligible for promotions or various other favorable terms and conditions of employment.

147.    On November 11, 2021, Ms. Ferris submitted a complaint with Comcast Listens, again raising concerns about discrimination and retaliation.

148.    Ariel Price ("Ms. Price") was assigned to investigate the complaint. However, neither Ms. Price nor anyone else from Comcast ever followed up with Ms. Ferris or investigated her complaint.

149.    Instead, under the PIP, Ms. Ferris was required to have weekly meetings with Ms. DeCaro, which took more time away from her ability to perform her duties.

150.     Ms. Ferris amended her Charge a number of times throughout the course of her employment with Comcast, and she submitted her final rebuttal statement on or about March 5, 2022.

151.     Meanwhile, Ms. Ferris desperately wanted to leave the West Division of Comcast, and she began exploring other divisions of Comcast based on her conversations with other minority employees at Comcast.

152.     Ms. Ferris continued to actively search for open positions for which she could apply once the Final Written Warning expired.

153.     Ms. Ferris applied for a Supplier Diversity Analyst position with Comcast, which would allow Ms. Ferris to work on a different team.

154.     Ms. Ferris received an offer to for Comcast's Supplier Diversity Analyst position on in June 2022, which is Ms. Ferris' current position at Comcast.

155.     Ms. Ferris' work as a Diversity Analyst has only confirmed the pattern, practice, and culture of discrimination and retaliation against Black employees at Comcast, and particularly its West Division.

### FIRST CLAIM FOR RELIEF
**Discrimination**
**(Title VII, 42 U.S.C. §2000e-2)**

156.     Ms. Ferris incorporates by reference the allegations in paragraphs 1 through 155 above as if fully set forth herein.

157.     Ms. Ferris is a Black woman.

158.     Comcast, by and through its executives, employees, and/or agents, discriminated against Ms. Ferris with respect to her compensation, terms, conditions, and

privileges of employment because of Ms. Ferris's race and gender as described hereinabove.

159.     As a direct and proximate cause of Comcast's unlawful employment practices, Ms. Ferris has sustained damages, including, but not limited to, back pay, front pay, compensatory damages, attorney's fees, costs, pre- and post-judgment interest, and other damages to be determined at trial.

## SECOND CLAIM FOR RELIEF
### Failure to Promote
### (Title VII, 42 U.S.C. §2000e-2)

160.     Ms. Ferris incorporates by reference the allegations in paragraphs 1 through 159 above as if fully set forth herein.

161.     As a Black woman, Ms. Ferris belongs to at least two protected classes under the law.

162.     Ms. Ferris was qualified for various promotions during her employment at Comcast.

163.     Ms. Ferris was not promoted, nor was she even considered for various promotions, despite her qualifications.

164.     The promotional positions were filled or remained open after Comcast refused and/or failed to consider Ms. Ferris for a promotion.

165.     Ms. Ferris suffered damages as a result of Comcast's discriminatory failure to promote Ms. Ferris.

## THIRD CLAIM FOR RELIEF
### Retaliation
### (Title VII, 42 U.S.C. §2000e-3)

166.    Ms. Ferris incorporates by reference the allegations set forth in paragraphs 1 through 165 above as if fully set forth herein.

167.    Ms. Ferris engaged in various protected activities under the law, including, but not limited to, inquiring about promotional opportunities, raising formal and informal internal complaints about discrimination, filing Charges of Discrimination with the EEOC, and other activities described herein.

168.    Comcast retaliated against Ms. Ferris for engaging in those legally protected activities by taking various adverse actions against Ms. Ferris, including, but not limited to, issuing unwarranted discipline and other retaliatory actions referenced hereinabove.

169.    As a direct and proximate cause of Defendant's unlawful employment practices, Ms. Ferris has sustained damages, including, but not limited to, back pay, front pay, compensatory damages, attorney's fees, costs, pre- and post-judgment interest, and other damages to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Ms. Ferris respectfully requests the following relief:

a.   Back pay;

b.   Front pay;

c.   Compensatory damages;

d.   Equitable relief;

e. Attorney's fees;

f. Costs;

g. Pre- and post-judgment interest;

h. Any and all other relief available under applicable law

Dated:  February 28, 2022.

Respectfully Submitted,

**ATTORNEY FOR PLAINTIFF**

*/s/Samantha L. Pryor*
Samantha L. Pryor, Esq. #39194
THE HALLIBURTON LAW FIRM, LLC
8354 Northfield Blvd. Suite 3700
Denver, CO 80238
303-803-1060
spryor@thehalliburtonlawfirm.com